We'll hear DNV Investment v. SGM Holdings. Together, we're going to hear from both sides. Thank you. May it please the Court, Your Honor. My name is Richard Gaines, and I represent the plaintiff appellants in this case. I very much appreciate you all allowing me to argue today. It was my fault. We're looking forward to hearing you. Thank you, Your Honor. This case was originally brought in the Western District of Tennessee. It is somewhat complicated in its facts. It is a case by the investors against companies and individuals, chiefly for inducement of fraud. Fraud in the inducement. And that case was brought in the Western District of Tennessee, transferred by Judge Lipman there, up to the Southern District of New York, where it was before Judge Crotty. Judge Crotty, after hearing motion— In the Middle District of Tennessee, fraud in the inducement is separate from a derivative claim as a partner in the project? This is a direct claim you're saying? Yes, Your Honor, it is. I didn't hear the first part of your question. I'm sorry, Your Honor. I'm sorry. I asked, in the Middle District of Tennessee, there is law that says fraud in the inducement is a direct as opposed to a derivative claim? No, Your Honor, I don't believe there is, actually. I don't know that for sure on Tennessee. Then what is your claim? Why isn't it all derivative? It isn't derivative, Your Honor, because our clients suffered direct damages. We're under the New York standard under continental casualty that we're using right here. And so the New York standard and the New York law based on fraud in the inducement by individuals and companies to our clients prior even to the investment firm being fully funded. And how would those damages differ from the damages they suffered derivatively? Well, Your Honor, that's the question. That's the exact question I'm going to answer, and that's what Judge Crotty ruled, actually. Continental casualty came out and said that you do have a tort for direct damages by partners in the Limited Liability Corporation if you can show fraud in the inducement. And our point was that ---- Fraud in whose inducement of what? Well, Your Honor, we say the individuals and companies that we've sued, not only in documents, induced and verbally and directly verbally, and that's our complaint, and it should be taken as true, induced my clients, the punitive class, to invest in the investment in MET 13, which is the investment company who later subsidized things out to other companies. They had no assets at all when they put their investment in. So how do we measure damages? Well, Your Honor, the damages are exactly the amount of money that we paid in to that investment company. MET 13 did have value, unlike what Judge Crotty stated. It had value because it was under a contract, under a confidential disclosure memorandum. Contracts. Yes, and a subscriber agreement. And it had the intent of the investors was an expectation that MET 13 would carry on with either developing the oil and gas reserves or selling the property for a higher price. So if we agree with you and you say the measure of damages is what you put in on the day you bought in to this deal, would you also get derivative damages as limited partners? Because you can't double count this. That's exactly right. That's exactly right. That is one of the distinctions in continental casualty that's from our case. There were prior suits on behalf of the partners and on behalf of MET 13 that were all settled. There is a settlement agreement, and there's orders by Judge Sherwood on that. And there is a release for some of the parties. However, our individual rights for direct damages are not released. Those — But wouldn't you have to set off whatever you got in the settlement? Absolutely, Your Honor. We didn't get a penny from the settlement. Us investors, unlike continental casualty, where it was clear there was an issue of whether the investors were going to double dip because a trustee was also conducting an investigation. In this case, that stuff's all over. The only way for us to recover anything, and we have not recovered a penny off what turns out to be an absolutely worthless investment, is to get — is to have this claim of a fraud on the inducement even prior to MET 13 really being fully funded. I thought you said a moment ago that there was a settlement with these defendants. No, Your Honor. And the — and the partnership. Your Honor, no. Our clients, my clients, the investors, the classic — I understand. They did not settle anything. I understand that. I didn't ask you that. I asked whether the partnership itself entered into a settlement with some or all of these defendants. Your Honor, the manager of that part — yes, MET 13 in part may have settled with some of these other parties. They may have. Well, it's not — I'm sorry, there's a factual question in the record of whether Mr. — Well, these were exchanged. The leases were exchanged by the partnership, and there was a general release for lawsuit pretty broadly, actually, by the general partner and others for MET 13. But he didn't have the authority to release these individual claims by way of the CDM and subscriber agreement on page — on Joint Appendix page A77 and A78. Did he purport to? I don't believe he did, Your Honor. I think there is a question about who signed what at the time of these settlement agreements and whether Mr. Lesiak, who is the manager, actually did sign and did release any investors. It's not clear investors were released. And he had no authority to release our claims. Well, you know, so a corporation gives a release. It's not clear that the shareholders have given a release either, is it? No, Your Honor, but — The question, you look at the law, and you find out whether it is — whether a derivative claim exists in the first place, or if it does, whether it survives. Your Honor, I definitely agree. And that's certainly what Continental Casualty seems to say. If we had parallel money that was being given to us on a pro rata share based on a derivative claim, then we'd either have to subtract that from our direct damages, or we wouldn't have no lawsuit. But there is nothing like that. And Mr. Lesiak, the manager, under A77 and A78 of the Joint Appendix, that's the CDM that describes his power of attorney, he would have had to get special permission from the investors themselves, my clients, to give our release to any kind of lawsuit based on our direct damages. Moreover, our direct damages occur before MET-13 is even funded. Our fraud occurs when we write the check. Because we, taking our complaint as true, we are defrauded at that time. We are defrauded at that time. And we're reasonably relying on the statements and documents provided to us. But your check is to the partnership. Check is to the partnership. Yes, Your Honor. To MET-13. And we have given that. We have expectation of value because we have a thought about what that company is going to do. Right. And MET-13's partner has some authority, power of attorney, some. But when those lawsuits were resolved, he did not have the authority to continue to waive our direct claims. That's what the law and continental casualty in the New York Court of Appeals and other cases that follow it say. Partners have that right to sue for their direct damages. In this case, we received nothing in damages, not a penny, on an investment that was worthless, that they knew was worthless at the day we signed our check. Who's they? They being the defendants, Lawrence Field, Richard Featherly, SGM, other company, Premier. MET-13? Your Honor? MET-13 also? No, Your Honor. I understand that might be a core question, and we certainly would like to know more about what Mr. Lesiak knows, the manager. He is barred from talking to us, Your Honor. He's barred from talking to us. The prior lawsuit has made it so that he is concerned about his own liability. There's a clause that says he cannot encourage lawsuits. We need to depose him. Actually, that's one of the other differences in continental casualty you're getting to. This motion to dismiss was all done without any discovery. We've got no discovery, no depositions. Right. So this is a motion to dismiss, right? Yes, Your Honor. It is. And continental casualty is different because of a lot of reasons. One, there was at first it establishes a claim for us. Two, there was discovery, plenty of it in that case, that determined damages. Three, there was two parallel cases going on, and the plaintiffs looked like they were going to double dip. And that's not the case in this case. And four, I know there's a fourth distinction, but there is a lot of distinction. There's a lot of things. Continental casualty, we agree with. We agree with that case. But it's distinct from this case. So we're asserting simply our direct fraud prior to MET-13. True enough, probably it is extremely important that we talk to the MET-13 manager and get more information through deposition or interrogatories, get more discovery. In order to be able to state a claim? No, Your Honor. No, we've stated a claim because we have sufficient information to state a claim based on our complaint as true of fraud. Whether we have to know. Do you know the terms of the settlement that you say may or may not have taken place? If it took place, what would be the terms? Your Honor, I don't know if the terms matter because he never had the authority to give, to waive. No, I understand that. But just to deal with things that don't matter, what were the terms? Your Honor, I can only speak generally to the terms. It did, it was what was termed initially as a global settlement release. Judge Sherwood put down an order trying to resolve all the issues. Did money? Money did not come to us. Money did not go to MET-13. Did money go to MET-13? Your Honor, I don't believe it did. And a pro rata share was not determined. The investment itself was worthless and actually may cost MET-13. If the investment is worthless, presumably that's why people sue. Then if they settle, sometimes they get money. And the question is, did they get money? And if they got the money and they didn't give it to the investors, you may have a claim against MET-13. Yes, Your Honor. That could be true if that were the case, if they received money that we don't know about. Yes. But that's a derivative suit, isn't it? Well, Your Honor, it would be part of our direct suit for fraud if it turned out it was based on fraudulent statements. I know we want to keep going back to derivative suit. You should also understand that these plaintiffs in counted casualty were asking for a lot of other things like expectation of profit and management fees. We're not asking for that. Look, we're just asking for our direct check we wrote into the fund back. We want our money back. We've reserved rebuttal. One minute, Your Honor. Thank you. Thank you, Your Honors. Dan Schulman for Applebee's Defendants, SGM Holdings, et al. Counsel, I have in front of me the language to which opposing counsel alludes from continental casualty, and you have to tell me why it doesn't apply in this case. Neither party disputes, they said in 2010, I believe, that plaintiffs as limited partners of a partnership may assert a direct claim of fraud in the inducement. Why doesn't that make their claim direct instead of derivative? Your Honor, Judge Pooler, that is the relevant language. And the relevant language is whether or not at the time of investment, they're asserting claims that they have at the time of investment. Because here, counsel, in papers below, has expressly waived any claim after the date of investment. The language in the brief says something to the effect of after the check was written, we have no claims. So what happened at the date of investment? At the moment they invested, they had the claim. But they didn't have a claim, Your Honor. What the private placement memorandum annexed to the complaint here says, and what counsel admits in their papers below in the brief at page 9, that's Southern District Docket Entry 65, is that at the date of investment, MET-13 wasn't operational. It wasn't operating. This is not only derivative. It didn't have contracts. It didn't have anything. Did they have the two contracts that they needed the $23 million to pay on? One was the deep, one was the shallow, and one was the deep? Your Honor, there were no. The short answer is no. The long answer is, this is not just derivative. It's doubly derivative. The way MET-13 was going to work as set forth in the private placement is they were going to lend money at 20% plus 2.5% to their manager to Reed Energy, LLC. Reed Energy was then going to do due diligence, as the private placement says, as would the general partner of MET-13, do due diligence, and then decide whether or not to acquire these assets. The shallow rights you mentioned, there was an option contract for $12 million for the shallow rights. They did due diligence. They acquired it for $3 million. Why weren't these contracts worth something? They didn't have no closing on this until January 4th of 2012. The investments were December of 2011. They were the property of MET-13. No, they were not the property of MET-13. Who had the ownership of these contracts? First of all, there were no ownership of any contracts for the deep rights. The shallow rights was an option owned by SGM at that time. On January 4th, 2012, well after they invested, there was a closing, at which time the option contract was transferred. And given the option contract was to buy the shallow rights for $12 million, and they did due diligence and decided that it wasn't worth $12 million, I would respectfully submit that it wasn't worth much. In fact, worth probably negative, since at that point you have an option worth nothing. These investors invested based on the assumption that there would be due diligence by Reed, there would be due diligence by the general partner of MET-13, after which they would decide what to invest. They ended up not investing in some of the deep rights. They ended up buying the shallow operation for 25% of what the option was for. And not all the components of the shallow operation. They bought just in Ohio, not Ohio and West Virginia. I think they left off five levels. The Blasius were investing in something. They were investing. This is like an open-ended equity fund. They were investing in the intelligence of their fund manager to find great investments. And to do due diligence on those investments. And to appoint someone to run Reed Energy to find those investments and invest. What I'm hearing is Judge Pooler asked you why there would not be a claim for fraud in the inducement at the time the check was written.  Invalid, wrong, unsupported, and everything else. But can we go back to that question? There were no assets as of the date of investment. MET-13 had zero assets. It didn't have a contract. It didn't have any rights. What if your adversary's clients were told that they had a contract? That they had rights? That they had expectations? And that turned out to be false. Hypothetically, wouldn't that be a claim for fraud in the inducement that an investor could make? I have problems accepting that hypothetically. Well, you cannot have problems accepting a hypothetical. A hypothetical is something other than this case. So you can't avoid answering it. But, Your Honor, I think that the — If you avoid answering it, you've answered it. Your Honor, if there is a contract, and there wasn't because the private placement memorandum says there wasn't at A67 and 68 and 74, Appendix 6, then it's speculative. Purchasing something with no track record, what this Court has called as inherently speculative oil and gas investments, land which has never been drilled for oil and gas. What I'm hearing is that there's no assets, there's no contract, there's no ownership. There's no settlement. There's no money that went around. There were no releases. Your Honor, no, I haven't said that. Nobody knows anything. It's very difficult to see how you prevail on a motion to dismiss, especially since you have not really answered why it is that there cannot be a fraud in the inducement. I think you have to admit there can be a fraud in the inducement claim for an investor in a limited partnership if the fraud sucks the person into the investment. No. If, as Constance gradually says, if the plaintiff can show that what they purchased was overvalued, there was a portfolio that was overvalued at the time they have a claim. Well, suppose it's worth nothing. Suppose they have nothing. They had nothing at the time. All they had was the expectation. It's overvalued. No. If you pay something for nothing that you've — look, I'm not sure I understand. Suppose you have an open-ended investment fund. But you realize if there's two judges who don't understand any of this, it's going back. Your Honor, if you have an open-ended investment fund, which is effectively what this is, you're investing money into a fund. The fund managers are then going to decide what we're going to buy. But that wasn't really this case. Everybody that invested thought that they were buying an oil field that was going to make them rich. They didn't think we're just giving money to Fidelity and Fidelity is going to be smart and put it in good stocks. They had a specific plan that had been disclosed to them that is alleged to be fraudulent, right? They had a plan whereby there would be due diligence after investment, with the money scattered from the investment, to determine whether it was worth buying these things. That's what it says at A66-67. There will be due diligence afterwards to see if these things are worth something. At page 66, the CDM explains, by investing in MET-13, the limited partners were purchasing a debt investment and equity interest in Reed LLC. They purchased something. An entity which is not operating is not purchasing anything. They're purchasing 52% of Reed. And if you continue to A-74, it says, before there are any investments by Reed, we'll put Reed in operation. That's what it says at A-74. So Reed's not operating at that point. It's afterwards. So what you're doing is they're investing in the hope and expectation that Metropolitan Equity Partners, the founder of MET-13, would do something right in the future. And I will note one other thing. We heard today the claim that, well, maybe we have a claim against MET-13 or its general partner. Well, at paragraph 130 of the second amendment complaint at A-224, they specifically say, there was no fraud in solicitation of funds or in operation. They say that they don't have a claim against MET-13. So what they're doing is they're saying they have a claim against an entity which has been released by MET-13 for these doubly derivative claims of things that might be purchased in the future by Reed or might not be. So these are all facts that are unknown. They have had no discovery. Your Honor, no. It is absolutely agreed that at the time they invested, there was nothing, there was no portfolio. It was absolutely agreed Reed wasn't operating. That's in the private placement, the CDM. It was absolutely agreed that there were going to be due diligence before they bought anything. The thing that MET-13 had was the value related to the specific opportunity described therein, the opportunity to hold a debt investment and equity interest in the shallow and deep operations. That's what they had. They had a right to do due diligence about it, and in April of 2012, they finally purchased the shallow rights. But surely you realize that due diligence is a thing you can do when you have a contract, because a contract will allow you to do due diligence and may allow you to withdraw. But if you do your due diligence and you're satisfied, a contract can allow you to do the transaction. They didn't have a contract in December when there was investment made. There was no contract, period. There was nothing. Was there a settlement between MET-13 and or its general partner and these defendants? There was a global settlement agreement negotiated dated November 30, 2012, which I negotiated, 160 pages long, in which the parties exchanged general releases. SGM gave up its interest in Reed for a $2.5 million interest in MET-13. There were monies paid. There were monies to be paid. There were transfer of assets. There was transfer of rights. There's all kinds of things. 160 pages, which I negotiated with Blank Rome and Steptoe & Johnson. Yes, there was a global settlement agreement. MET-13 has the proceeds of the settlement. To the extent they were paid anything, they have the proceeds. Look, you negotiated. So when you tell me to the extent they got anything, you know the extent to which they got anything. They gained certain. Did they or didn't they? They didn't get money. We got money. They got certain rights. And we gave up equity interest in MET-13. Excuse me. We had a 40% equity interest in Reed, which we gave up for an interest in MET-13. And the global settlement agreement is incorporated by reference in the complaint. And it's in the record. So the answer is they were given assets in exchange for the global settlement. The global settlement exchanged theoretically millions of dollars of assets. And our client gave— You say theoretically because it's not really true, right? What's that? You say theoretically because it's not really true. Well, what happened is at the time of—in December 2011, oil was over $100 a barrel. January 2016, when there was a sale of acreage, it was $28 a barrel. Oil is an inherently speculative quantity. And when you're talking about land which has never been drilled and disputes among partners of whether you spend the money drilling or spend the money doubling down and buying another, instead of 6,000 acres in the CDM, 35,000 acres, which is why there was a settlement, you're going to have disputes as to whether, in fact, what it was worth. And ultimately, because of delays in selling and whatever, it ended up not selling for what it was worth. Although, in fact, we did get some sales for several million dollars, including after the lawsuits were brought. We found the sales, and we brought them. If I could briefly address two other things, Your Honor. I'm sorry. What things? I think also the fact is they failed to state a claim here, both for RICO and for fraud, both under Rule 9 and Rule 12. Under RICO, they assert RICO, at the first preliminary conference, Judge Crotty looked at them and said, well, doesn't the Private Securities Litigation Reform Act of 1995 bar a claim for fraud in connection with sale of securities? I intend to ask Mr. Gaines about RICO. And you'll note in their papers they don't cite two things, 18 U.S.C. 1964C, which is the provision which says RICO applies and that it waives all claims, and they don't cite a case which Your Honor was on the panel of, MLMSK Investment. I may have changed a couple of the letters there, which specifically held that, no, you don't have a claim. So they don't have a RICO claim. That's gone. They don't even address the statute, let alone the controlling precedent. But they have the wire fraud and mail fraud claim. And MLMSK held that you can't avoid it. The plain language of 1964C of the RICO amendment in PSLRA bars you from pleading around the RICO amendment in PSLRA by claiming wire fraud. That's what it held. That's whatever case in this district, in this court, has held. By pleading what? By pleading wire fraud, you can't avoid the restriction. You have to plead two predicate acts for RICO, obviously. Prior to 1995, fraud in the connection with sales securities was held to be a predicate act. In 1995, it was amended. It said, no, a case in which you plead fraud in connection with sales securities is not, in fact, does not constitute a predicate act. Intelligent plaintiffs thereafter said, all right, I won't say it was fraud in connection with sales securities. I'll say it was wire fraud. What did the court say, including this court and one of these panelists? No, you can't do that. Congress is very clear, and MLMSK cites to the congressional record and to the plain language of the statute. The plain language of the statute and the congressional record are both clear that you can't do that. The intent was to avoid people pleading around by arguing wire fraud, mail fraud, or something else. When the substance of the case is fraud in connection with sales securities, as we just heard, there's no RICO claim, no predicate act. If I could have one second. Sorry, Your Honor. Your Honor, I'll be brief just real quickly since I'm going to borrow time as well. This is not a hedge fund. This is not a Wildcat investment. There was expectation. There was contracts. There was a subscriber agreement. There was a CDM. You concede that the wire fraud and the mail fraud cannot serve as predicates for the RICO claim? Your Honor, I'm not an expert on RICO. A RICO claim was made in this—I do not want to concede to that at this time. A RICO claim was made out of an abundance of caution in this case. I believe there could be merit to Mr. Shulman's claim, but I can't concede to it yet. We do have significant wire fraud claims of fraud in this case, Your Honor, and that goes into our ultimate inducement claim as well. Right. So the Second Amendment complaint states accords of action, you claim, for fraud based on misrepresentations and omissions in the CDM as well as for conspiracy between the defendants. Your Honor, if they have made an agreement to commit fraud, then our claim would have been a conspiracy based on—and I'm more of a federal criminal lawyer. I just want that made clear. Yes, Your Honor. It's not the RICO claim. Your Honor, I think that there could be plenty of other legal issues that haven't been—were not decided by Judge Crotty that could be decided by the district court. But some discovery—and I want to come back to some discovery, including the manager. Remember one thing as we talk here, that Med 13's manager was never—he never talked to us. We never were able to talk to him. He essentially had a gag order. We never deposed him. So whether he's a target of amended complaint or not, we believe not. We believe he was the subject to fraud as well and helped transfer that fraudulent intent on to the investors. You mean he was a victim of fraud? Yes, Your Honor. We believe at this time, based on what we know, that he was a victim rather than a proponent of the fraud. So we didn't sue him. But we don't know that. And after a lengthy deposition, we'll know a lot more. But we never got to discovery. The district court didn't go into the global settlements at all, in his opinion, did he? Except to— No, Your Honor. He put a footnote down and said that he likely thought the global settlement agreement might actually encompass this dismissalist lawsuit. And I countered today already with that by saying that the manager and the companies that were involved in that global settlement agreement did not have the authority to release our direct claims. But he didn't reach those issues because— No, Your Honor, he didn't. He didn't. It was a footnote and a third page of his opinion. Okay, thank you. Thank you, Your Honor. Thank you both. Will reserve decision. The United States v. Saban is taken on submission. Ankee Chen v. Coven is taken on submission. And Yagman v. Kitay is taken on submission. That's the last case on calendar. Please adjourn court. Court is adjourned.